Charles William DAVIS,
Petitioner-Appellant,

v.

Gary MAYNARD, Warden, Oklahoma State Penitentiary at McAlester, Oklahoma, Respondent-Appellee.

No. 87–1657.

United States Court of Appeals,
Tenth Circuit.

March 14, 1989.

---

1402

Robert A. Ravitz, Public Defender, Oklahoma County Public Defender's Office, Oklahoma City, for petitioner-appellant.

Susan Stewart Dickerson, Asst. Atty. Gen. (Robert H. Henry, Atty. Gen., of Oklahoma, with her on the brief), Oklahoma City, Okl., for respondent-appellee.

Before MOORE and BALDOCK, Circuit Judges, and O'CONNOR, District Judge.*

BALDOCK, Circuit Judge.

Petitioner-appellant, Charles William Davis, was charged by information in the District Court of Oklahoma County, Oklahoma, with the first degree murders of Dennis McLaughlin and Robert Wayne Jones in violation of 21 Okla.Stat. § 701.7. The State alleged that on the morning of August 13, 1977, Davis mortally wounded McLaughlin and Jones with a .38 caliber pistol at his home in Oklahoma City. The cases, CRF–77–2905 and CRF–77–2906, were consolidated, and trial ensued on February 21, 1978. On February 27, 1978, the jury returned a verdict of guilty. Later that day, the jury in a separate proceeding under 21 Okla.Stat. § 701.10, sentenced Davis to death.

Davis at the time of the incident was a fifty-two year old parolee from the State of Missouri. He had been convicted there in 1942 of murder in the first degree and sentenced to life imprisonment. On June 22, 1977, Davis married twenty-four year old Kathy Mae Rogers. She lived with him at his apartment in Oklahoma City for twelve days before moving back to her prior home in Sapulpa, Oklahoma, on August 3. At around 5:30 a.m. on August 13, 1977, Kathy returned to the apartment along with her brothers, Henry and Robert Wayne Jones, and a friend, Dennis McLaughlin, to gather her personal belongings which Davis had threatened to burn. Davis was at home when they arrived. After the four had completed packing Kathy's belongings onto Henry's truck, they returned to the apartment for a final check. Davis, who was outside at that moment, then entered the apartment holding a gun. Kathy testified that Davis said "I thought I told you to bring the car back," and fired. Trial Tr. at 348. (Kathy and Davis had purchased a car which Kathy subsequently wrecked in Sapulpa). Davis continued to aim and pull the trigger even after all

---

* The Honorable Earl E. O'Connor, Chief Judge, United States District Court for the District of Kansas, sitting by designation.

available rounds were spent. Kathy and Henry were each shot once in the head but survived. Dennis McLaughlin died as a result of two gunshot wounds through the head. Robert Wayne Jones suffered fatal gunshot wounds to the head and back. Davis immediately fled the scene. He was apprehended carrying a loaded .38 caliber pistol in California two days later.

Davis' sole defense at trial was self-defense. Although firearms were never visible on any of the four, Davis testified that immediately prior to the shooting, he believed both Henry and Dennis were reaching for concealed weapons. As a result, Davis opened fire. Davis claimed that he loved Kathy and did not intend to kill anyone. His probation officer testified, however, that while Davis stated he believed the murders were justified, "he would rather that Kathy had died." Trial Tr. at 858.

Davis unsuccessfully appealed his conviction and sentence to the Oklahoma Court of Criminal Appeals. *Davis v. State,* 665 P.2d 1186 (Okla.Cr.), *cert. denied,* 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983). He then unsuccessfully sought relief under the State's "Post–Conviction Procedure Act," 22 Okla.Stat. §§ 1080–88. *Davis v. State,* Nos. CRF–77–2905 & CRF–77–2906 (D.Ct. Okla.Cty. Dec. 28, 1984), *aff'd,* No. PC–85–55 (Okla.Cr. March 21, 1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 900 (1986). Having exhausted his available state court remedies as prescribed by 28 U.S.C. § 2254(b), Davis filed this action under § 2254(a) in the Western District of Oklahoma seeking a writ of habeas corpus. In a thorough opinion, the district court denied Davis relief.

Upon a certificate of probable cause pursuant to Fed.R.App.P. 22(b), Davis appeals from the judgment of the district court alleging seven state trial errors of constitutional magnitude. *See* 28 U.S.C. § 2254(a) (federal court shall entertain application for a writ only on ground that petitioner is incarcerated in violation of the Constitution or laws of the United States). Davis claims, as he has throughout the course of post-trial review, that (1) the jury instructions tendered in the guilt phase of his trial

improperly shifted the burden of proof, (2) the trial court improperly denied his request for a psychiatric examination at state expense to assist in his defense, (3) the trial court improperly excluded for cause members of the venire based upon their response to inquiries about the death penalty, (4) the prosecutor's closing argument in the sentencing phase of his trial improperly diluted the jury's sense of responsibility for the sentence imposed, (5) the jury instructions tendered in the sentencing phase of his trial improperly defined the nature and function of mitigating circumstances, (6) the anti-sympathy instruction improperly led the jury to discount mitigating evidence presented in the sentencing phase of his trial, and (7) the State applied the "especially heinous, atrocious or cruel" aggravating circumstance instruction in an improperly vague and overbroad manner. Our jurisdiction to review these points arises under 28 U.S.C. § 2253. We affirm the denial of the writ but vacate the sentence of death as constitutionally impermissible on the record before us.

## I.

Davis' only challenge to his conviction is aimed at the instructions provided the jury in the guilt phase of his trial. According to Davis, certain instructions required him to come forth with evidence to reduce the homicides from first degree murder to manslaughter in violation of the rule established in *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), that "the Due Process Clause protects the accused against a conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In deciding the role that the contested instructions played in Davis' conviction, we are mindful that instructions "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The burden § 2254 imposes upon Davis is not insignificant:

> The burden of demonstrating that an erroneous instruction was so prejudicial

that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned.'"

*Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (quoting *Cupp*, 414 U.S. at 146–47, 94 S.Ct. at 400); *accord Hunt v. State*, 683 F.2d 1305, 1310 (10th Cir.1982). Because we find no such error in the instructions to the jury in the guilt phase of Davis' trial, we sustain his conviction.

The trial court in this case instructed the jury on first degree murder and first degree manslaughter, as well as self-defense, as defined by Oklahoma law. After informing the jury in instruction three of the presumption of innocence, and of the State's burden to prove Davis guilty beyond a reasonable doubt, the court defined the elements of each offense. In instruction five, the court first quoted the definition of murder contained in 21 Okla.Stat. § 701.7: "A person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being." In the same instruction, malice was defined as a "deliberate intention, a premeditated design to take away the life of a human being which is manifested by external circumstances capable of proof." The court then charged the jury in instruction seven that the crime of murder in Oklahoma embraces the lesser included offense of manslaughter: "[T]he statutes of this State define homicide as manslaughter in the first degree when perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitutes justifiable homicide." *See* 21 Okla. Stat. § 711. The court defined "heat of passion" in instruction eight as "anger,

rage, resentment, fear or terror," and stated: "In order to reduce a homicide to first degree manslaughter, this passion must have existed to such a degree as would naturally destroy the sway of reason and render the mind incapable of cool reflection, and thus exclude malice aforethought." In instruction ten, the court distinguished malice from heat of passion and charged the jury that "[m]alice and heat of passion cannot co-exist."

■ Davis' claim that instruction 5A placed an unconstitutional burden upon him to show the absence of a "design to effect death" is nonsense. Instruction 5A reads:

You are further instructed that a design to effect death *may be inferred* from the fact of the killing when that killing is done by the use of a dangerous weapon in such a manner as naturally and probably to cause death unless the circumstances raise a reasonable doubt whether such design existed [emphasis added].

The instruction contains the "entirely permissive inference or presumption, which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant." *County Court v. Allen*, 442 U.S. 140, 157, 99 S.Ct. 2213, 2224, 60 L.Ed. 2d 777 (1979). In other words, the jury could properly find a "design to effect death" based upon the circumstances surrounding the killings. But the jury was equally free to reject the inference if it found that the predicate facts proved by the State did not justify the suggested conclusion. Thus, the burden of proof did not shift to Davis. *Francis v. Franklin*, 471 U.S. 307, 314, 105 S.Ct. 1965, 1971, 85 L.Ed. 2d 344 (1985). A permissive inference transgresses due process "only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.* at 314–15, 105 S.Ct. at 1971. Because a rational trier of fact could easily conclude that Davis possessed a "design to effect death" based upon the underlying facts proven at his trial, we find no error in instruction 5A.

*See Allen,* 442 U.S. at 163–67, 99 S.Ct. at 2227–30.

■ Davis' argument that instructions eight and nine required him to present evidence to reduce the homicides from first degree murder to manslaughter is similarly meritless. These instructions respectively described the terms "heat of passion" and "adequate provocation" as used in the definition of manslaughter set forth in instruction seven. Both admittedly spoke in terms of the elements necessary to "reduce" a first degree murder to manslaughter. And while we do not condone the instructions' terminology, neither these instructions nor any others created a mandatory rebuttable presumption requiring the jury to find malice aforethought upon proof of certain predicate facts unless Davis persuaded the jury that he acted in the heat of passion and with adequate provocation. *Compare Mullaney v. Wilbur,* 421 U.S. 684, 686–87, 703–04, 95 S.Ct. 1881, 1883–84, 1892–93, 44 L.Ed.2d 508 (1975) (defendant's conviction could not stand where jury was instructed that if prosecution established that homicide was both intentional and unlawful, malice aforethought was to be conclusively implied unless defendant proved by a preponderance of the evidence that he acted in the heat of passion on sudden provocation). The instructions considered in their entirety placed upon the State the affirmative duty of proving malice aforethought beyond a reasonable doubt. If the jury determined that the State had failed to meet its burden in that regard, the jury was instructed to consider whether the government's evidence established the elements of manslaughter beyond a reasonable doubt. Instructions eight and nine merely attempted to clarify for the jury the distinction between murder and manslaughter. Moreover, instruction ten directed the jury to consider "all the surrounding circumstances and conditions ... including previous relations and conditions connected with the tragedy as well as those existing at the time of the killing" before determining whether Davis acted in the heat of passion or with malice. In this case, the instructions did not impose any burden whatsoever on Davis by requiring the jury to presume the elements of the crime upon proof of predicate facts, but rather placed upon the State the burden of proving every element of first degree murder beyond a reasonable doubt.

■ Davis' reliance on our decision in *United States v. Lofton,* 776 F.2d 918 (10th Cir.1985), is misplaced. Davis claims *Lofton* supports his argument that in every first degree murder case where malice aforethought is an element of the crime, the jury must be instructed *in haec verba* that the government has the burden of proving the absence of heat of passion. We do not read *Lofton* so broadly. *Lofton* arose from a defendant's direct appeal of his murder conviction under 18 U.S.C. 1111(a). Although the defendant's sole defense at trial was that she acted in the heat of passion on adequate provocation, the trial court failed to instruct the jury on her theory of defense or even distinguish heat of passion and malice as inconsistent mental states. Based on these facts, we held that "a defendant in a federal murder case who has sufficiently raised a heat of passion defense is entitled to instructions informing the jury of the theory of defense and of the Government's duty to prove beyond a reasonable doubt the absence of heat of passion in order to obtain a murder conviction." *Id.* at 920.

■ Aside from the two cases' procedural differences, Davis, unlike Lofton, never raised the heat of passion defense at his trial. Instead, his sole defense was self-defense. The instruction on manslaughter presumably was given because under Oklahoma law, that crime is a lesser included offense of first degree murder. Whether such an instruction under the facts of this case was warranted is debatable. *Cf. United States v. Scafe,* 822 F.2d 928, 932–33 (10th Cir.1987) (where evidence would not permit a rational jury to find defendant guilty of a lesser offense, instruction on that offense is unnecessary). But the instructions in this case, unlike those in *Lofton,* explicitly defined malice and heat of passion as mutually exclusive. The jury's finding of malice necessarily implies the

absence of heat of passion. At least where the defense is not squarely raised and the instructions properly define the differing mental states, the jury need not be instructed specifically that the prosecution must prove the absence of heat of passion when the element of malice is neither presumed nor required to be disproved by the defendant. *See United States v. Molina–Uribe*, 853 F.2d 1193, 1200–05 (5th Cir. 1988). We are convinced that the record developed in the guilt phase of Davis' trial "establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986).

## II.

■ Davis' second contention concerns the State's refusal to provide him funds for a psychiatric examination designed to assist in the presentation of mitigating evidence in the sentencing phase of his trial. In *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985), the Supreme Court held that when a defendant demonstrates to the trial judge that his mental capacity "is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Because Ake's insanity defense was based upon fact rather than unsupported allegations, and the State's case relied heavily upon expert testimony concerning Ake's continuing criminal threat to society, the Court concluded that due process entitled Ake to the assistance of a psychiatrist.

In this case, a judge during a pre-trial hearing originally ordered that Davis be examined at a state hospital, but the hospital refused to admit him in the absence of a statutory basis for the judge's ruling. On the day of trial, the trial judge denied Davis' motion for a continuance on the testimony of the hearing judge that the requested examination was not necessary to ensure a fair trial: "My thinking was

that it's not one of those things that is necessarily necessary, but it would sure be nice to have if you were a Defendant in a first degree murder case." Motion Tr. at 24; *see also id.* at 25.

Davis' motion for a psychiatric examination was based on a general allegation of need without substantive supporting facts and contained "little more than undeveloped assertions that the requested assistance would be beneficial." *Caldwell v. Mississippi*, 472 U.S. 320, 323–24 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985). We recently stated that "[i]n order for a defendant's mental state to become a substantial threshold issue, the showing must be clear and genuine, one that constitutes a 'close' question which may well be decided one way or the other." *Cartwright v. Maynard*, 802 F.2d 1203, 1211 (10th Cir. 1986), *vacated in part on other grounds*, 822 F.2d 1477, 1478 n. 2 (1987), *aff'd*, — U.S. ——, 108 S.Ct. 693, 98 L.Ed.2d 645 (1988). In this case, Davis wholly failed to demonstrate that his mental capacity presented a substantial issue for trial. Davis' counsel admitted his client did not suffer from any mental disease. Trial Tr. at 877. Nor, contrary to *Ake*, did the issue of Davis' "future dangerousness" play a role in the sentencing phase of his trial. The State presented no psychiatric testimony on that issue, and the jury failed to find as an aggravating circumstance that Davis constituted a continuing threat to society. We find no error in the State's refusal to assist Davis in obtaining a psychiatric evaluation.

## III.

■ Davis next contends the trial judge's exclusion for cause of certain venire members contravened his sixth amendment right to an impartial jury in the sentencing phase of his trial. In *Witherspoon v. Illinois*, 391 U.S. 510, 522–23 n. 21, 88 S.Ct. 1770, 1777–78 n. 21, 20 L.Ed.2d 776 (1968), the Supreme Court held that potential jurors could be excused for cause when their opposition to the death penalty "automatically" would lead them to vote against a sentence of death or would impair their

task of determining defendant's guilt or innocence. The Court, however, subsequently modified *Witherspoon*'s holding in *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980), when it held that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 426–30, 105 S.Ct. 844, 853–55, 83 L.Ed.2d 841 (1985), later confirmed that a trial judge's factual determination regarding a potential juror's bias under the *Adams'* standard should be afforded a presumption of correctness in accordance with 28 U.S.C. § 2254(d). Unless the defendant produces clear and convincing evidence of an erroneous factual determination, the death sentence should remain undisturbed. *Id.* at 435, 105 S.Ct. at 857. "[T]he question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." *Id.* at 434, 105 S.Ct. at 857.

Davis has objected throughout these proceedings to the exclusion for cause of venire members Hearst, Musgrave, Dragus, Rockel and Metiver. The trial judge began by asking each potential juror the following question: "In a case where the law and evidence warrant, in a proper case, could you, without doing violence to your conscience, agree to a verdict imposing the Death Penalty?" Trial Tr. at 138, 220, 224, 227, 289. Unless the venire member's reply was unequivocally yes, the judge then asked:

> If you found beyond a reasonable doubt that the Defendant in this case was guilty of Murder in the First Degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the Death Penalty such that regardless of the law, the facts and the circumstances of the case, you would not inflict the Death Penalty?

*Id.* at 144, 221, 224, 227, 289–90. Hearst answered "I believe I could" in response to

the first inquiry, *id.* at 138, but when asked to be more specific and questioned further by both the trial judge and defense counsel, he eventually answered "I'm afraid that is true" in response to the second inquiry, *id.* at 144. Musgrave similarly answered "I believe I could" to the first question, but when asked the same question again responded "I don't believe I could." *Id.* at 220–21. She then answered "no" to the second inquiry. However, in response to defense counsel's question: "Do I hear that to mean that you could possibly impose the Death Penalty in some particular case?", Musgrave said "yes." *Id.* at 221–22. Metivier stated she had problems with imposing the death penalty, *id.* at 289, and specifically answered "no" to the judge's second inquiry. *Id.* at 290. Dragus' and Rockel's responses to questions about the death penalty were likewise equivocal. *See id.* at 224–29.

The voir dire to which Davis objects is indeed troublesome. Under *Adams,* 448 U.S. at 49–50, 100 S.Ct. at 2528–29, the proper inquiry is whether prospective jurors are willing and able to follow the court's instructions and obey their oaths, regardless of their personal feelings about the death penalty. Consequently, the trial judge's first question to the venire members is of little relevance. *Witherspoon,* 391 U.S. at 515–16 n. 9, 88 S.Ct. at 1773–74 n. 9, recognized that 'conscientious or religious scruples' against infliction of the death penalty have little to do with whether a juror could vote to impose such a sentence in a case where the law and evidence warranted: "Obviously many jurors could notwithstanding their conscientious scruples against capital punishment, return a verdict of death and make their scruples subservient to their duty as jurors." The second question, while a better attempt to incorporate the proper standard, is confusing, and because of its negative phrasing, invites ambiguous answers. For instance, does "no" mean that the jurors' reservations about the death penalty would not impair their ability to inflict the sentence in a proper case, or does "no" mean that the jurors would not inflict the death penalty

despite the law and evidence? The dissenting judge on the Court of Criminal Appeals aptly noted: "This voir dire is replete with confusion." *Davis*, 665 P.2d at 1204–05 (Brett, J., dissenting in part). Nevertheless, we are not prepared to conclude on this record that the venire members' exclusion for cause constitutes reversible error.

In *Witt*, 469 U.S. at 424–26, 105 S.Ct. at 852–54, the Court established that prospective jurors' bias towards the death penalty need not be proved with "unmistakable clarity" before they could be excluded for cause:

> [D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [T]his is why deference must be paid to the trial judge who sees and hears the juror.

The trial judge's assessment of the prospective jurors' demeanor and credibility is not easily discernible from the written record. Thus, where some ambiguity appears in the record, the judge, considering the questioning as a whole and using his sound discretion, was entitled to resolve the issue of juror bias in favor of the State. *Id.* at 428–29, 434–35, 105 S.Ct. at 854–55, 857–58; *accord Darden v. Wainwright*, 477 U.S. 168, 175–78, 106 S.Ct. 2464, 2469–71, 91 L.Ed.2d 144 (1986).

Relying on *Witt*, we recently upheld in *Coleman v. Brown*, 802 F.2d 1227, 1231–32 (10th Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987), four prospective jurors' challenge for cause under questions and answers very similar to those at issue here. We agree with *Coleman* that "the *Witt* Court ceded a great deal of authority to state trial judges to determine whether a juror should be excluded." *Id.* at 1232. Affording the trial judge's findings in this instance a "presumption of correctness," we conclude that he properly found the challenged venire members' views likely to "prevent or substantially impair" the performance of their duties as jurors.

## IV.

Davis' challenge to the prosecutor's closing argument in the sentencing phase of his trial is likewise unavailing. According to Davis, the prosecutor played on the jurors' passions and downgraded their sense of responsibility for the sentencing decision in violation of the eighth amendment. The eighth amendment requires that a death sentence depend upon a complete assessment of each case's individual circumstances. *Coleman*, 802 F.2d at 1239. Therefore, comments which tend to evoke a wholly emotional response from the jury or dilute the serious nature of the sentencing process may give rise to constitutional error. *Caldwell v. Mississippi*, 472 U.S. 320, 329–30, 105 S.Ct. 2633, 2639–40, 86 L.Ed.2d 231 (1985).

■ Davis first claims the following comments led the jury to believe responsibility for the sentencing decision rested elsewhere:

> You know, you're not sitting there as individual people that you are in your other walks of life. You are as a body. A juror. And you perform a part of this system just as I do. Just as Justice Cook—Judge Cook does.
>
> And just as the Justices on the Supreme Court in reviewing Death Penalty cases, as Mr. Stuart suggests do. So all of us all along the system have responsibilities and duties, and each of us and all of us along the way have to have the courage to stand up for what we believe in....
>
> But each of us are simply a part of a system that is greater than any of us

are. And more important really than any of us are. Trial Tr. at 895–96. We find nothing in these remarks, however, which rises to constitutional error.

In *Dutton v. Brown*, 812 F.2d 593, 596–97 (10th Cir.) (en banc), *cert. denied*, —— U.S. ——, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987), we rejected a constitutional challenge to similar comments and noted: "The statement was not designed to, nor did it, suggest to the jury that it was not ultimately responsible for deciding Mr. Dutton's punishment. The prosecutor merely underscored that the jury was part of the whole system of justice, and within that system it had a grave responsibility." In that case, the prosecutor had told the jurors that they were "part of the process" and were "not functioning as individuals."

Similarly, in *Parks v. Brown*, 860 F.2d 1545, 1549–52 (1988) (en banc), we again rejected the notion that comments which emphasized the jury's part in the criminal justice system transgress the Constitution. In *Parks*, the prosecutor had stressed that the jury was "just part of the criminal-justice system." We held that the prosecutor's comments did not mislead the jury "into thinking it had a reduced role in the sentencing process." *Id.* at 1550 (quoting *Darden*, 477 U.S. at 184 n. 15, 106 S.Ct. at 2473 n. 15). Like the remarks in *Dutton* and *Parks*, the prosecutor's comments in this case did not unconstitutionally diminish the jury's sense of responsibility for its sentencing decision. While the remarks may have been intended to place the jury's role in perspective, they certainly did not lessen the jury's perception of its duty.

■ Davis also contends that other comments by the prosecutor diverted the jurors' attention from the facts of his case and aroused arbitrary emotional responses against him. Specifically, Davis focuses on the following comments:

[Y]ou cannot commit crimes of this kind with impunity. And a life sentence for this man isn't punitive. We tried that already. And it didn't work. Where does that leave us to go? What else can we do? What other alternative

is there? You know how Charlie is. You have seen him up here. You have seen him talk to people. Do you think he will serve any time at all? He suggests it wouldn't happen. We are asking you to take—to enter a Death Penalty provision which will ultimately take his life, and you say that is a heavy thing to do.

I suppose you don't do it, and you pick up the morning paper in a month or a week of five years, and he has killed somebody else. How do you live with that? How do you say to yourself: You know, if I had had the courage to do what was right and what the evidence compels and what the law requires, if I had had the courage to do it then, it wouldn't have happened.

Not only is there the distinct possibility that by coming out and saying no more, that you might deter others from this act....

Trial Tr. at 906–07. Despite Davis contrary assertion, these remarks are permissible.

■ In *Coleman*, 802 F.2d at 1239, we recognized that where future dangerousness is an aggravating circumstance under state law which, if found, may lead to imposition of the death penalty, comments about a defendant's future dangerousness and his chances of rehabilitation are proper. Under 21 Okla.Stat. § 701.12, the likelihood that a defendant guilty of first degree murder, if spared, may pose a continuing threat to society is an aggravating circumstance. Thus, the prosecutor's comments about the possibility of future criminal acts by Davis pass constitutional muster. Likewise, the prosecutor's comments regarding the penological justifications for the death penalty, in this case the deterrence effect, are appropriate for closing argument and will not be disturbed. *Id.*

### V.

■ Davis' fifth asserted error of constitutional proportion involves the allegedly incomplete instructions on mitigating circumstances. Davis argues that his death sentence cannot stand because the jury

failed to comprehend the nature and function of mitigating circumstances. Our review of jury instructions tendered in the sentencing phase of a capital trial centers on how a reasonable juror might construe the instructions. *California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987). We will overturn the chosen sentence only if a "substantial possibility" exists that a reasonable juror construed the instructions in an improper manner. *Mills v. Maryland,* — U.S. —, 108 S.Ct. 1860, 1867, 100 L.Ed.2d 384 (1988).

Instruction six in the sentencing phase of Davis' trial listed six factors which, if deemed to exist, could be considered in mitigation of punishment. The list, however, was not exhaustive as the instruction further provided:

> You shall consider any or all of these minimum mitigating circumstances which you find apply to the facts and circumstances of this case. You are not limited in your consideration to these minimum mitigating circumstances. You may consider additional mitigating circumstances, if any, you find from the evidence in this case. What are and what are not additional mitigating circumstances is for you the jury to determine.

After informing the jurors that they would be authorized to consider the death penalty if they found beyond a reasonable doubt the existence of any of four enumerated aggravating circumstances, instruction five continued: "If you ... find that such aggravating circumstance or circumstances is out weighed [sic] by the finding of one or more mitigating circumstances, the death penalty shall not be imposed." Instruction twelve reiterated this balancing test. *See* 21 Okla.Stat. § 701.11 (unless at least one of the statutory aggravating circumstances is found or if any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed).

In *Zant v. Stephens,* 462 U.S. 862, 875 n. 13, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983), the Supreme Court stated that the Constitution does not require specific standards for balancing aggravating and mitigating circumstances. What the Constitution does require is a set of instructions which ensures that a reasonable juror will understand the meaning and function of mitigating circumstances: "[A] jury should be instructed that the law recognizes circumstances which may considered as extenuating or otherwise reducing a defendant's culpability and hence his punishment." *Andrews v. Shulsen,* 802 F.2d 1256, 1264–65 (10th Cir.1986), *cert. denied,* — U.S. —, 108 S.Ct. 1091, 99 L.Ed.2d 253 (1988).

Although the trial judge in this instance did not tender an instruction which defined the term "mitigating circumstance," neither did the judge in *Andrews,* where we upheld similar sentencing instructions. *Id.* at 1265 ("trial judge recited the statutory mitigating circumstances, although he did not label them as such or explain their meaning and function"). Considering the instructions in their entirety, the jury in this instance, like its counterpart in *Andrews,* could not have misunderstood the role of mitigating circumstances. The jurors were instructed that mitigating factors should be accounted for in reaching their decision, and that such factors should be balanced against any aggravating circumstances found to exist beyond a reasonable doubt in deciding between life and death. This is all the Constitution requires.

## VI.

Davis' sixth contention focuses on that portion of sentencing instruction thirteen pertaining to sympathy: "You should not allow sympathy, sentiment or prejudice to affect you in reaching your decision. You should avoid any influence of passion, prejudice or any other arbitrary factor when imposing sentence." Davis claims the instruction undermined the jury's consideration of the mitigating evidence he presented regarding his good character, *see* trial tr. at 837–72, in violation of the eighth amendment. *Parks v. Brown,* 860 F.2d 1545 (10th Cir.1988) (en banc), governs our disposition of this issue.

In *Parks,* 860 F.2d at 1552–59, we held the following instruction tendered in the

sentencing phase of a capital case unconstitutional: "You must avoid any influence of sympathy, sentiment, passion, prejudice or other arbitrary factor when imposing sentence." Because this instruction may have led a reasonable juror to discount sympathy based on the mitigating evidence, it could not withstand a constitutional challenge: "[S]ympathy that *is* based on the evidence is a valid consideration in sentencing that cannot constitutionally be precluded." *Id.* at 1553 (emphasis in original). *But see California v. Brown,* 479 U.S. 538, 542, 107 S.Ct. 837, 840, 93 L.Ed.2d 934 (1987) (juror instructed to avoid influence of "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" would likely interpret it as an "admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence").

For purposes of eighth amendment analysis, this case is indistinguishable from *Parks.* Several of Davis' co-workers and acquaintances testified that he was a hardworking, considerate individual who didn't deserve to die. The instruction which directed the jury to remain unaffected by sympathy created a risk that the jury discounted Davis' evidence in reaching its sentencing decision. Nor can we conclude that the instructions considered as a whole remedied this problem. Instruction thirteen is overbroad and requires us to set aside the death sentence.

### VII.

■ Davis finally urges us to vacate his death sentence for the reason that it rests on an unconstitutionally vague and overbroad aggravating circumstance, namely that the murders were "especially heinous, atrocious, or cruel." The jury found three of the statutory aggravating circumstances enumerated in 21 Okla.Stat. § 701.12: (1) that the murder was especially heinous, atrocious or cruel; (2) the defendant was previously convicted of a felony involving the use or threat of violence to the person; and (3) the defendant knowingly created a great risk of death to more than one person. Crim.App.Rec. at 75. Instruction

eight defined the term "heinous" as "extremely wicked or shockingly evil," "atrocious" as "outrageously wicked and vile" and "cruel" as "designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others; pitiless."

We need look no further than *Maynard v. Cartwright,* —— U.S. ——, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), *aff'g,* 822 F.2d 1477 (10th Cir.1987), to conclude that the instruction to which Davis objects was applied in an unconstitutional manner. In that case, the jury found that the defendant "knowingly created a risk of death to more than one person" and that the murder was "especially heinous, atrocious, or cruel." The terms heinous, atrocious and cruel were defined by the exact language used in this case. We concluded these terms and their definitions failed to place " 'any inherent restraint on the arbitrary and capricious infliction of the death sentence.' " *Maynard,* 822 F.2d at 1489–90 (quoting *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980)). The Supreme Court agreed. Because the aggravating circumstance at issue did not sufficiently limit the sentencer's discretion, the risk of arbitrary and capricious action on the part of the jury could not withstand eighth amendment scrutiny. Thus, application of the aggravating circumstance fell for vagueness. *Maynard,* 108 S.Ct. 1856–57.

We are mindful that after Davis' conviction and sentence, the Oklahoma Court of Criminal Appeals in *Stouffer v. State,* 742 P.2d 562, 563–65 (Okla.Cr.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 763, 98 L.Ed. 2d 779 (1988), restricted application of the "especially heinous, atrocious, or cruel" aggravating circumstance to murders involving torture or serious physical abuse. The court further subjected application of the unconstitutionally vague aggravating circumstance to harmless error analysis by removing it from sentencing consideration and reweighing mitigating circumstances against any remaining aggravating circumstances. *See Wainwright v. Goode,* 464 U.S. 78, 86–87, 104 S.Ct. 378, 383–384, 78 L.Ed.2d 187 (1983). Shortly thereafter, the

court in *Castro v. State,* 749 P.2d 1146, 1150–51 (Okla.Cr.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988), held that the application of *Stouffer* to defendants convicted prior to that decision did not violate the prohibition of ex post facto laws. Soon after *Castro,* however, the Court of Criminal Appeals in *Dutton v. Dixon,* 757 P.2d 376, 378–81 (1988), held that 21 Okla.Stat. § 701.13(E), which allows the court to remand for resentencing, was an ex post facto law because it permitted reinstitution of a death sentence —a result not possible under prior court decisions. The court in a terse statement found *Castro* inapplicable. *Dutton,* 757 P.2d at 382. What effect these Oklahoma decisions may have on this case in view of our disposition of Davis' final two points of error is for the state court to address in the first instance.

## VIII.

The order of the District Court for the Western District of Oklahoma is AFFIRMED with respect to the denial of the writ of habeas corpus, but REVERSED with respect to its denial of all further relief. The case is REMANDED to the district court with directions to enter judgment that the writ of habeas corpus is denied but, as law and justice require, the death sentence of petitioner is invalid under the eighth amendment to the United States Constitution. The execution of the petitioner under this invalid death sentence is enjoined. This judgment is without prejudice to further proceedings by the state for redetermination of the sentence on the conviction.